UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH ALEXANDER #269879,

        Plaintiff,                       Case No. 07-14741

vs .                                DISTRICT JUDGE GERALD E. ROSEN
                                  MAGISTRATE JUDGE STEVEN D. PEPE

CITY OF SHELBY TOWNSHIP,
SHELBY TOWNSHIP POLICE
DEPARTMENT, OFFICER GOEBEL,
OFFICER WYLIE, OFFICER JOHN
DOE, OFFICER JOHN DOE, *et al.*,

        Defendants.
_____/

**REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. #37)**

      This case arises out of events surrounding Plaintiff's traffic stop and subsequent arrest on November 12, 2006.  Plaintiff brings suit under 42 U.S.C. § 1983 alleging violations of the First, Fourth, Fifth, Sixth, Seventh, Eighth and Fourteenth Amendments.  Plaintiff alleges that Defendants violated his rights by performing an illegal traffic stop, arresting him without cause, and using excessive force to effectuate his arrest and later transport to the hospital to obtain a blood draw.  Plaintiff seeks $437,000,000 in damages (Complaint, p. 14).

      On March 2, 2009, Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56 asserting no violation of the Fourth or Fourteenth Amendments occurred, the officers were entitled to qualified immunity, and no municipal liability (Dkt. #37).  All pre-trial matters were referred under 28 U.S.C. § 636(b) (Dkt. #6).  For the reasons stated below, it is **RECOMMENDED**

1

that Defendants' motion for summary judgment be **GRANTED**.

I.   **BACKGROUND**

On November 11, 2006, at about 8:00 or 9:00 p.m., Plaintiff left the Shelby Township home of Cynthia Elms, and drove to Pontiac where he intended to go bowling with friends (Plaintiff's November 10, 2008, Deposition, Dkt. #37, Ex. B, pp. 94-95). Plaintiff did not believe he had a valid driver's license at the time, but did not know if it was suspended (*Id.*, pp. 95-97). He was unable to meet up with his friends, and decided to stop at a party store where he purchased two 24-ounce beers (*Id.*, pp. 99-101). He then went to a friend's house where he consumed the two beers as well as "a couple more" 24-ounce beers and some shrimp in a two-hour period (*Id.*, pp. 102-04). He then left his friend's house to return to his home in Pontiac to pick up his ten-year-old son (*Id.*, pp. 106-07).

After picking up his son, Plaintiff began to drive back to Shelby Township, but his car got a flat tire while on M-59 (*Id.*, p. 108). Plaintiff decided to drive home "on the flat, on the shoulder of the road" (*Id.*, p. 110). He exited M-59 at Dequindre, went north and turned right onto West Utica Road (*Id.*, pp. 110-11). Plaintiff was driving with his hazard lights on at the time (*Id.*, p. 111). He noticed a police officer (Officer Goebel) behind him with his overhead lights on, and he pulled over to the side of the road (*Id.*, pp. 111-12). Plaintiff did not believe he had driven on or crossed the double yellow line (*Id.*), but Officer Goebel pulled him over because he had.[1] Plaintiff was driving at approximately five to ten miles-per-hour at the time he

---

[1] Officer Goebel testified that Plaintiff caught his attention because "the vehicle was driving on a totally flat tire . . . crossed over the center line, then crossed over into the shoulder also, and I conducted a stop on the vehicle" (November 27, 2006, Preliminary Examination, Dkt. #37, Ex. C, p. 5)

2

was pulled over (November 27, 2006, Preliminary Examination, Dkt. #37,  Ex. C, p. 11).

Plaintiff pulled over, got out of his car and approached Officer Goebel's vehicle (November 11, 2006, Videotape, Dkt. #37, Ex. A, 00:21:02-00:21:17).  Officer Goebel ordered Plaintiff to get back into his car, and he complied (*Id.*, 00:21:18-00:21:33).  Officer Goebel approached the driver's side of Plaintiff's car and "could smell the odor of intoxicants upon his breath, it got stronger as he spoke" (November 27, 2006, Preliminary Examination, Dkt. #37, Ex. C, p. 6).  Officer Goebel advised Plaintiff that he had a cracked taillight and asked for his driver's license, which he did not have (Plaintiff's November 10, 2008, Deposition,  Dkt. #37, Ex. B, pp. 114-15).  Plaintiff provided Officer Goebel with a paper license, which he had as a result of a previous operating while intoxicated ("OWI") conviction (*Id.*).  After obtaining this information and having an unrecorded two-minute conversation with Plaintiff, Officer Goebel returned to his vehicle and contacted the Shelby Township Police Department dispatch.  He was advised that Plaintiff had an outstanding warrant for domestic violence and a suspended license (November 11, 2006, Videotape, Dkt. #37, Ex. A, 00:26:06-00:26:43).

Officer Goebel, accompanied by non-party Officer Treworgy,[2] then returned to Plaintiff's vehicle, where Plaintiff admitted that he had been drinking (Plaintiff's November 10, 2008, Deposition,  Dkt. #37, Ex. B, p. 118).  Officer Goebel also advised him there was a "warrant for his arrest" and that he had a suspended license.  Officer Goebel then asked Plaintiff to exit the vehicle, walk to the back of the vehicle and remove his glasses (*Id.*, pp. 119, 122-23).

Officer Goebel took Plaintiff's right hand to handcuff him (November 11, 2006,

---

[2] Plaintiff identifies this second officer as Officer Wylie in his complaint (Complaint, ¶ 11).  The police reports and testimony of Officers Goebel and Wylie, however, make it clear that Officer Wylie was not present at the scene (Dkt. #37, Ex. C, p. 7; Ex. G; Ex. H, p. 4).

Videotape, Dkt. #37, Ex. A, 00:28:42).  Before the handcuffs were on, Plaintiff moved his right

arm and turned to his right (*Id.*, 00:28:49).  Officer Goebel grabbed both of Plaintiff's arms and

forced his upper body onto the trunk of the car, where he finished handcuffing Plaintiff and

checked the handcuffs (*Id.*, 00:28:50-00:29:36).

       Officer Treworgy attempted to get Plaintiff to spread his feet apart by sweeping

Plaintiff's right ankle/foot with his left foot, but three times Plaintiff shuffled his left foot toward

his right (*Id.*, 00:29:48-00:29:56).  On the final attempt, Officer Goebel blocked Plaintiff's left

foot with his right foot and Officer Treworgy moved Plaintiff's right foot (*Id.*, 00:29:59-

00:30:00).  Officer Goebel then performed a frisk of Plaintiff, including a check of Plaintiff's

pockets (*Id.*, 00:30:01-00:31:11).  During the frisk, Plaintiff spoke to both officers.

       Once in the police cruiser, Officer Goebel asked Plaintiff if he would take a preliminary

breath test, but Plaintiff refused (*Id.*, 00:35:45-00:36:03).  Officer Goebel informed Plaintiff that

he was pulled over because he was driving on a flat tire, and that it was unsafe (*Id.*, 00:36:49-

00:37:03).  On at least three occasions while Plaintiff was in the patrol car,  Officer Goebel

advised Plaintiff that he was being arrested on the outstanding warrant, for OWI and for driving

on a suspended license (*Id.*, 00:37:50-00:37:55, 00:39:28-00:39:38 and 00:46:00-00:46:03).

       During the drive to the Shelby Township Police Department, Officer Goebel informed

Plaintiff that once they arrived he would ask Plaintiff to submit to a breath test, and if Plaintiff

refused, a warrant for a blood draw would be obtained (*Id.*, 00:41:46-00:41:54).  Plaintiff

complained that the handcuffs were hurting him, and Officer Goebel advised Plaintiff to turn

sideways to relieve the pressure (*Id.*, 00:43:08-00:43:21).  At different times during the drive,

Plaintiff directed the following at Officer Goebel: "A motherfucker need to start busting your

motherfucking brains out – on duty and off duty, sucker" (*Id.*, 00:47:19-00:47:28); "And you pull these cuffs off when we get to the station and let's do this – me and you do this" (*Id.*, 00:47:38-00:47:43); "This 47-year-old man take your motherfucking ass out" (*Id.*, 00:47:44-00:47:48); "You fuck with me, god damn it, just like fucking with god.  I'm gonna have your ass" (*Id.*, 00:48:15-:00:48:19); "That's the way you honkies do it" (*Id.*, 00:48:45-00:48:46). Plaintiff did not recall making any of these statements (Plaintiff's November 10, 2008, Deposition,  Dkt. #37, Ex. B, pp. 142-145).

Upon arrival in the sallyport, Officer Goebel asked Plaintiff to exit the vehicle on the driver's side, but Plaintiff refused and exited on the passenger side after an unidentified officer opened the door (November 11, 2006, Videotape, Dkt. #37, Ex. A, 00:52:29-00:53:19).  Once in the booking area, Plaintiff was handcuffed to a bench (Plaintiff's November 10, 2008, Deposition,  Dkt. #37,, Ex. B, p. 148).  Plaintiff again refused to take a breathalyzer test, so a search warrant for a blood draw was obtained (Plaintiff's November 10, 2008, Deposition,  Dkt. #37, Ex. B, p. 149; & Ex. G, p. 18).

Plaintiff completed a written statement regarding his arrest, and was escorted by three officers to the sallyport to be transported to the hospital for a blood draw  (Plaintiff's November 10, 2008, Deposition,  Dkt. #37,  Ex. B, pp. 154-57).  Plaintiff was ordered by the officers, more than once, to get into the car (*Id.*, p. 160).  Plaintiff did not comply with the officers' orders, though he said he made three attempts to enter the vehicle, but was unable to because of cramps in his leg (*Id.*, pp. 161-67).  Officer Wylie warned Plaintiff that if he did not comply, he would be tased (*Id.*, p. 176; February 3, 2009 Deposition of William Wylie, Dkt. # 37, Ex. H, pp. 46-47).  Officer Wylie testified at his deposition that Plaintiff threatened to kill him and the other

two officers and to sue them if he was hurt.  (*Id.* at p. 17)  Officer Wylie deployed his Taser and

"touched it to [Plaintiff's] abdomen just above his belt" (*Id.*, at  p. 48), although Plaintiff stated

the Taser touched his chest near his heart (Plaintiff's November 10, 2008, Deposition,  Dkt. #37,

Ex. B, p. 170).  As a result of being tased, Plaintiff entered the back seat of the vehicle (*Id.*, p.

164).

      Plaintiff was transported to the hospital for a blood draw, and the result was a .19 blood

alcohol content ("BAC"), more than twice the legal limit of .08 ( Dkt. #37,  Ex. D).  He was

returned to the police station, and the booking process was completed.  Eventually, he was taken

to the Macomb County Jail and arraigned the next day on charges of driving on a suspended

license, OWI, and resisting and obstructing (Plaintiff's November 10, 2008, Deposition,  Dkt.

#37,  Ex. B, pp. 190, 194; (November 27, 2006, Preliminary Examination, Ex. C, pp. 15, 17).

Plaintiff was in jail for approximately four weeks and eventually pleaded guilty to resisting arrest

and OWI (*Id.*, Ex. B, pp. 193, 200-01; Ex. I, pp. 9-10).

## II.    ANALYSIS

### A.    <u>Legal Standards</u>

      Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party

demonstrates there is no genuine issue as to any material fact.  The Supreme Court has

interpreted this to mean that summary judgment should be entered if the evidence is such that a

reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue

as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz*

*v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the

Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).  But as the Supreme court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

**B.**    **Factual Analysis**

**1.**    ***The Traffic Stop and Arrest***

Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment.  *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  The reasonableness of the stop is ascertained by first determining "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).  "So long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful."  *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

Additionally, a police officer may effectuate a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Under Michigan traffic laws, it is unlawful to cross a double yellow line on a two-way roadway. M.C.L. 257.642(1)(a) prohibits the crossing of the center line except when making a left turn. Violation of the statute constitutes a civil infraction. M.C.L. 257.642(3).

Here, the police video shows the Plaintiff's vehicle traveling at a low rate of speed on a flat tire, and the rear driver's side tire (and by inference, the front driver's side tire) crossing over the double yellow line. Plaintiff disputes that his vehicle crossed the center line at all. On this point, Plaintiff is wrong. No reasonable finder of fact could view the police video and see anything other than Plaintiff's vehicle crossing the center line. In *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), the Sixth Circuit reversed the district court's judgment that an officer had probable cause to pull over a motor home that had partially crossed into the emergency lane of an Interstate for twenty to thirty feet. There, the Court determined that there had been no violation of the relevant traffic law which required that a vehicle "shall be driven as nearly as practicable entirely within a single lane." *Id.* at 466. In the present case, Plaintiff contends that he did not violate Michigan's traffic laws any more than did the appellants in *Freeman* violate Tennessee's traffic laws. The facts in *Freeman*, however, are clearly distinguishable from the facts here. The appellants in *Freeman* were traveling at the posted speed limit on an Interstate, and it was estimated that the officer who stopped them witnessed the vehicle cross the white line into the emergency lane for approximately one-third of a second. *Id.* at 467 (Clay, Circuit Judge, concurring). Additionally, it was a very windy day and the motor home was rounding a curve

8

when it crossed the line.  Moreover, the Court felt that an isolated incident of the motor home partially weaving into the emergency lane did not constitute a failure to keep the vehicle within a single lane "as nearly as practicable."  *Id.* at 466.  In the present case, the Michigan traffic law, which Plaintiff allegedly broke, states in unambiguous terms that a vehicle "shall not cross the center line of the roadway except where making a left turn."  M.C.L. 257.642(1)(a).  Unlike the Tennessee law, it does not contain the irresolute terms "nearly" or "practicable."  Moreover, from the time the rear tire of Plaintiff's vehicle touches the center line until the time his vehicle is fully back in the correct lane, a full six seconds elapse (Dkt. #37, Ex. A, 00:20:44-00:20:50). Based on this alone, Officer Goebel had probable cause to stop Plaintiff.

Plaintiff also argues that his arrest was invalid because Officer Goebel did not have probable cause to make the initial stop, thus there was no probable cause for the arrest.  As noted above, the officer did have probable cause to make the stop.  The arrest occurred after the stop which was legal. Plaintiff's argument concerning the subsequent arrest fails for two additional reasons: 1) Plaintiff's arrest was justified as a result of a valid, outstanding warrant; and 2) Plaintiff's arrest was justified based on probable cause that he had committed three criminal offenses: a) driving on a suspended license; b) OWI; and c) resisting and obstructing.

The Sixth Circuit has held that an officer cannot be found liable under 42 U.S.C. § 1983 for merely arresting someone on a valid, outstanding warrant.  "In a civil rights case, investigators are entitled to rely on a judicially-secured arrest warrant as satisfactory evidence of probable cause."  *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (citing *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989)).  Here, Plaintiff was arrested on an outstanding warrant that was published on the Law Enforcement Information Network ("LEIN") system.

9

Because the warrant had been authorized by a magistrate and confirmed as valid, it was sufficient to give Officer Goebel probable cause to arrest Plaintiff.  *See, e.g., U.S. v. Ellison*, 462 F.3d 557, 563 (6th Cir. 2006) (upon discovery of an outstanding warrant, officer had probable cause to arrest the person identified in the warrant).

Even if the outstanding warrant did not provide probable cause, circumstances arose during the stop that gave Officer Goebel probable cause to arrest Plaintiff.  Probable cause to arrest exists if reasonably trustworthy facts and circumstances known to the police officer were "sufficient to warrant a prudent man in believing the [arrestee] had committed or was committing an offense." *Diamond v. Howard*, 288 F.3d 932, 936-37 (6th Cir. 2002) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Here, Officer Goebel determined both through LEIN and Plaintiff's admission that Plaintiff was driving on a suspended license.  Additionally, Officer Goebel detected the odor of intoxicants on Plaintiff's breath and discovered, again through Plaintiff's own admission, that he had been drinking.  These uncontroverted facts provide a sufficient basis to find that Officer Goebel had probable cause to arrest Plaintiff.

Regardless of the facts surrounding Plaintiff's stop and arrest, he previously challenged a probable cause determination at a contested hearing (November 27, 2006, Preliminary Examination,  Dkt. #37, Ex. C).  Because of this, he is barred from challenging the issue of probable cause again. *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) ("[w]here the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action").

2.      *Excessive Force*

10

Claims regarding police officers' use of excessive force in the course of an arrest or other seizure are governed by the Fourth Amendment. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). Police officers may only use such force as is "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). To determine whether the force used was reasonable, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In addition, the court's consideration of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Courts evaluating the reasonableness of force used "should pay particular attention to . . . 'whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (internal citations omitted). "'Not every push or shove, even if it may later seem unnecessary'. . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Plaintiff has asserted three different excessive force claims. First, that Officers Goebel and Treworgy used excessive force while effectuating the arrest. Second, that the handcuffing itself was excessive because it caused Plaintiff pain. Third, that the use of the Taser in the sallyport to obtain Plaintiff's compliance amounted to excessive force.

11

### a.   The Arrest

Plaintiff argues that the "forceful slam" onto the trunk of his car was objectively unreasonable in light of his "brief flinch" when Officer Goebel was attempting to handcuff him (Plaintiff's Response Brief, Dkt. #39, p. 18).   In light of the *Graham* reasonableness standard and the videotape of the incident, this argument should fail.  As can be seen on the police video, when Officer Goebel attempted to handcuff Plaintiff, Plaintiff moved his right arm and began turning to his right.  Under the circumstances, it was impossible for Officer Goebel to know what, if anything, Plaintiff – who was clearly intoxicated and had not yet been searched – intended to do.  No reasonable jury could find that the officer's split-second decision to force Plaintiff's upper body onto the trunk of his car in order to expedite the handcuffing process was objectively unreasonable under the circumstances.

In his complaint, Plaintiff also alleges that non-party Officer Treworgy (incorrectly identified as Officer Wylie in the complaint) used excessive force when he "kick[ed]" Plaintiff's right leg.  (Complaint, ¶ 11).  The police video establishes that the "kick" was merely a leg sweep for the purpose of making Plaintiff spread his legs to effectuate a search incident to arrest.  No reasonable jury could find there was use of excessive force here.

### b.   The Handcuffing

Plaintiff argues that the handcuffs were placed on him too tightly, which caused him pain, and that amounts to excessive force.  Sixth Circuit case law requires "a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight."  *Vance v. Wade*, 546 F.3d 774, 782 (6th Cir. 2008) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002)); *see also Lyons v. City of*

12

*Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005) ("[T]he plaintiff must allege some physical injury from the handcuffing, and must show that the officers ignored plaintiff's complaints that the handcuffs were too tight").

Here, Plaintiff does not allege any physical injury. Instead he proffers a hypothetical situation that obviously did not occur. If, as Plaintiff hypothesizes, "it was discovered that the cuffs had cut Plaintiff's hands to the bone," then he would have a valid excessive force claim. Yet, despite Plaintiff's apparent wish to have suffered a serious injury, he did not. There is no medical or other objective evidence that he was cut by the handcuffs, let alone "to the bone." Additionally, Officer Goebel did not ignore Plaintiff's complaints that the handcuffs were causing him pain. Officer Goebel had tension checked the cuffs to assure enough space for his arms but not too much space, and double locked the cuffs so they could not tighten or loosen. (Feb. 3, 2009, deposition of Justin Goebel, Dkt. # 37, Exh. E., at 32) On at least two occasions during the drive to the police station, Officer Goebel informed Plaintiff that he should turn to his side to relieve the pressure on his hands and wrists.

### c.     The Sallyport

Plaintiff argues that the tasing incident in the sallyport prior to his transport to the hospital for a blood draw constituted excessive force. This claim, for which there is no videotaped record, is the most problematic as to whether it should be allowed to proceed to trial. Nonetheless, it is recommended that summary judgment be granted Defendant Wylie on the merits or alternatively under qualified immunity. Sixth Circuit law is hazy as to whether or not the use of a Taser to gain a handcuffed arrestee's compliance is considered violative of the Fourth Amendment. Yet, in *Devoe v. Rebant*, 2006 WL 334297 (E.D. Mich. 2006), this Court

held that a single use of a Taser to obtain an arrestee's compliance was a reasonable use of force under the circumstances. In that case, after being handcuffed, the arrestee continued to argue with the officers and refused to comply with their verbal commands to enter the patrol car. *Id.* at *6. The court reasoned that attempting to physically force the arrestee into the vehicle would have escalated the situation, and either he or the officers could have been injured. The facts here are similar.

Plaintiff does not cite to any case where a court found the use of a Taser to be unreasonable.[3] Plaintiff instead relies on an unpublished Sixth Circuit case for the proposition that "gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." *Bultema v. Benzie County*, 146 Fed. App'x. 28, 35 (6th Cir. 2005) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). In that case, the plaintiff alleged two instances of excessive force after he was handcuffed: one when he was barely able to stand on his own and the officer used pepper spray on him; the second occurred after he had been sprayed and the officer punched him in the head. *Id.* at 35-36. The Court held that the use of force in both instances was constitutionally unreasonable. *Bultema* is distinguishable from the present case, because here Plaintiff was not "subdued" because he was able to move his legs freely, and he refused to enter the patrol car. Additionally, the use of force in this case was not "gratuitous," as its purpose was to gain Plaintiff's compliance.

It is undisputed here that Plaintiff did not comply with the officers' orders to enter the patrol car, even though the orders were repeated multiple times. On the earlier police video

---

[3] In his brief, Plaintiff points to an incident where an individual died after being tased by Shelby Township police officers. Yet, in that case, the Taser was specifically ruled out as the cause of death.

14

Plaintiff was shown to be argumentative during the drive to the police station and, as noted above, went so far as to threaten police officers in general and Officer Goebel specifically. While Officer Wylie did not observe this specific conduct, Plaintiff's uncooperative and belligerent behavior continued when he arrived at the Police Station and Officer Wylie observed it when Plaintiff threatened him and others in the Sallyport.  (Feb. 3, 2009, deposition of Justin Goebel, Dkt. # 37, Exh. E., at 48;  February 3, 2009 Deposition of William Wylie, Dkt. # 37, Ex. H, p. 17)  Given these circumstances, no reasonable jury could find Officer Wylie's use of the Taser was objectively unreasonable under the circumstances nor that constituted excessive force.

### 3.    *Plaintiff's Fourteenth Amendment Claims*

Plaintiff claims that his right to equal protection was violated by Defendants throughout the series of events beginning with the traffic stop and ending with Plaintiff being tased.  In order to state an equal protection claim based on discriminatory acts, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of his or her membership in a protected class.  *See Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990). Moreover, conclusory allegations of unconstitutional conduct are insufficient to state a claim under § 1983 – some factual basis for the claim must be set forth in the pleadings.  *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).  Accordingly, to be in violation of the Constitution, unequal enforcement of the laws must be based upon "race, religion, or some other arbitrary classification," and "there must be an affirmative showing of clear and intentional discrimination."  *Butcher v. Department of Natural Resources*, 158 Mich. App. 704, 708 (1987).

In Plaintiff's complaint, he avers that he is African-American, but provides no evidence that he was stopped, arrested, allegedly handcuffed too tightly and tased based upon his race.  He

15

made only conclusory assertions that "**Shelby Township Police Department**, [*sic*] is known for **'Racial Profiling'**," and that "'[t]hey assume that every 'black man' is a drug dealer by the **'car'** he drives and the **'clothes'** he ware's [*sic*]" (emphasis in original).  (Complaint, ¶ 39).  In his response to Defendants' motion, he adds as support to his claim that "Defendants have not alleged or testified that they have tasered other individuals in the sallyport for having leg cramps. Plaintiff was treated differently than others similarly situated.  The difference in treatment is because of Plaintiff's race."  (Dkt. #39, pp. 24-25).  Plaintiff, perhaps, misapprehends the law.  It seems that he would have Defendants prove that they did not treat him differently based upon his race before he has made any showing of fact that he was actually treated differently because of his race.  Because Plaintiff has not supplied any factual basis for this allegation, his equal protection claim cannot stand.

Plaintiff also asserts substantive due process claims, though it is not entirely clear which actions by Defendants supposedly violated his rights.  Further, the only mention of due process in Plaintiff's response is in the opening paragraph of his argument, where he ties a substantive due process claim to the traffic stop, arrest and alleged use of force.  Assuming Plaintiff's due process claim is based solely on these events, this claim must fail.  "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Here, the events underlying Plaintiff's claim clearly implicate the Fourth Amendment, therefore a substantive due process analysis is inappropriate.

16

Plaintiff's procedural due process claim regarding the impoundment of his vehicle must also fail. "Generally, '[t]he essential requirements of due process . . . [are] notice and an opportunity to respond.'" *Ross v. Duggan*, 402 F.3d 575, 584 (6th Cir. 2004) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). Plaintiff was clearly notified that his vehicle was to be impounded, as Officer Goebel informed him of this on at least one occasion during the drive from the scene of Plaintiff's arrest to the police station. Additionally, Plaintiff has not alleged in his complaint, or elsewhere, that he was denied an opportunity to respond.

### 4. *Plaintiff's Remaining Claims*

Plaintiff also alleges violations of the First, Fifth, Sixth, Seventh and Eighth Amendments (Complaint, ¶¶ 8, 16, 21-25, 27, 29, 37, 42, 46). None of these claims against Defendants are remotely sustainable. It appears Plaintiff has aimed "in the general direction of the federal Constitution with buckshot." *Chiplin Enterprises, Inc. v. City of Lebanon*, 712 F.2d 1524, 1526 (1st Cir. 1983). It is not clear from the complaint which of his First Amendment rights Plaintiff feels was violated, and he does not elucidate this in his Response to Defendants' motion. The Fifth Amendment only applies to federal actors. *See generally Sturgell v. Creasey*, 640 F.2d 843, 850 (6th Cir. 1981). "The Sixth Amendment protects criminal defendants during trial." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 679 (6th Cir. 2005). The Seventh Amendment "preserves the right to a jury trial in suits at common law." *Osborn v. Haley*, 549 U.S. 225, 252 (2007). The Eighth Amendment only applies to post-conviction treatment of individuals. *See Ingraham v. Wright*, 430 U.S. 651, 671-672, n. 40 (1977) ("the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt"). Plaintiff's complaint concerns events that occurred

17

between the time he was stopped by Defendant Goebel and the time the booking process was completed. Therefore, none of Plaintiff's rights under these Amendments have been violated.

     **5.**    ***Qualified Immunity***

     Government officials who perform discretionary functions are also generally entitled to qualified immunity from individual liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense and the plaintiff need not anticipate it in the complaint. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Once a defense of qualified immunity is asserted, the plaintiff must respond with "specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity." *Veney v. Hogan*, 70 F.3d 917, 922 (6th Cir. 1995). A Court may find it beneficial to answer two questions when ruling upon a qualified immunity issue. One inquiry is whether, considered in the light most favorable to the party claiming injury, the facts establish that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 522 U.S. 194, 201 (2001) (citing *Seigert v. Gilley*, 500 U.S. 226, 232 (1991)). The other question is whether that constitutional right was clearly established at the time. *Id.*; *Summar v. Bennet*, 1957 F.3d 1054, 1058 (6th Cir. 1998). Under *Saucier*, it was mandated that these questions be addressed in order, but that requirement has since been relaxed. *See Pearson v. Callahan*, ---- U.S. ----, 129 S.Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.")

If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.  In such a case the use of force exceeded that allowed by the Fourth Amendment, but the reasonable, albeit mistaken officer, is entitled to qualified immunity from damages claims in a civil rights suit.  Thus, the qualified immunity inquiry's concern is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  In addition to reasonable mistakes as to the perceived facts, there may be a reasonable mistake as to the application of a legal standard in a certain set of facts where reasonable police officers may differ as to the correct determination.  Thus, an officer might correctly perceive all of the relevant facts, but have a reasonable, albeit mistaken, understanding as to whether a particular amount of force is legal in those circumstances.  *Saucier,* 533 U.S. at 195.  Officers are provided qualified immunity for reasonable mistakes as to the legality of their actions where "the mistaken belief was reasonable."  *Id.* at 206.   "Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force,' *Priester v. Riviera Beach,* 208 F.3d 919, 926-927 (11th Cir. 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Id.*  Thus, in the Fourth Amendment context there is a gray area between that force which is clearly excessive and that which is clearly reasonable.

The Fourth Amendment right to be free from excessive force is clearly established. Therefore, the question of qualified immunity turns on the determination whether a reasonable officer in Defendants' position would have known that their alleged actions violated clearly established rights.  As noted in the above analysis, it is believed that there was no use of

excessive force.  Yet, even if this Court were to find that there had been an excessive use of force, or that that question cannot be determined as a matter of law, then Defendants would still be entitled to qualified immunity because the events were such that no reasonable officer under the circumstances could know to objective certainty that his actions violated clearly established law.  Here, Defendant Wylie, the officer who used the Taser on Plaintiff, is certified as a Taser instructor (Dkt. #37, Ex. H, p. 50).  As such, he is familiar with its effects, and that it is not appropriate to deploy a Taser in all circumstances.  In this situation, he felt that because Plaintiff was not complying with the officers' orders to enter the patrol car, and that the use of physical force had a greater potential to escalate the situation and cause injury to Plaintiff or the officers, that use of the Taser was reasonable.  Even if reasonable officers might disagree on this conclusion, the decision and judgment of Officer Wylie was not so clearly wrong that it loses the protections of qualified immunity.  As both Plaintiff and Defendants stated in their depositions, the moment the Taser was used, Plaintiff entered the patrol car, thus ending the confrontation. Consequently, it cannot be said that a reasonable officer in the Defendants' position would have known that their actions violated clearly established rights.  Therefore, regardless of an excessive force determination, Defendants are entitled to qualified immunity.

## 6. *Municipal Liability*[4]

In order to bring a § 1983 claim against a municipality, a plaintiff must establish 1) that the harm was caused by a constitutional violation; and 2) that the city is responsible for that violation.  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 120 (1992).  Municipalities

---

[4] While Plaintiff has named the Shelby Township Police Department as a defendant, it is not a legal entity subject to suit.  *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Thus, the municipal liability claim only applies to Shelby Township, not the police department.

cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Monell v. New York City Dept. of Social Services*, 436 U.S. 685, 691 (1978); *see also Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 442 (6th Cir. 2000) (quoting *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997) (a plaintiff must demonstrate the municipality's deliberate conduct was the "moving force" of a plaintiff's injury)). The plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993). Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy, which policy can be attributed to a municipal policy maker. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Here, Plaintiff points to the policy put in place by Shelby Township – the "use of force continuum" – that allows for officers to use Tasers if they feel that their verbal commands are not being complied with. Yet, as shown in the above analysis, there was no constitutional violation, thus Plaintiff cannot meet his burden of proof. Therefore, Plaintiff's municipal liability claim must fail.

## III.   RECOMMENDATION

For the reasons indicated above, it is **RECOMMENDED** that Defendants' motion be **GRANTED**, and this case be dismissed. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR

21

72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474, U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 27, 2009                                             s/Steven D. Pepe
Ann Arbor, Michigan                                             United States Magistrate Judge

I certify that a copy of the foregoing document was sent to all parties and counsel of record via electronic and/or ordinary mail.

                                             s/Diane Opalewski
                                             Case Manager